[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 17-15330; 17-15338
Non-Argument Calendar

_____

D.C. Docket Nos. 6:16-cr-00214-CEM-GJK-1,
6:17-cr-00089-CEM-KRS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL ANTHONY NELSON,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(January 9, 2019)

Before BRANCH, HULL and JULIE CARNES, Circuit Judges.

PER CURIAM:

In these consolidated appeals, Michael Nelson challenges his concurrent 30-

month and 24-month custodial sentences imposed upon revocation of his two

supervised release terms.  On appeal, Nelson argues that his revocation sentences are procedurally and substantively unreasonable.  After review, we affirm.

## I.  BACKGROUND

### A.    Prior Fraud Convictions in Florida and Texas

Nelson has an extensive history of fraud and has been convicted of fraud-related offenses four times in federal court.  In 1999 in Florida, Nelson's first federal fraud conviction involved a wire fraud, bank fraud, and money laundering conspiracy whereby Nelson created a corporation through which he secured fraudulent loans for office and computer equipment.  The district court in the Middle District of Florida sentenced Nelson to 60 months' imprisonment, followed by three years of supervised release, and ordered him to pay $723,232.29 in restitution.

While on pretrial release in the 1999 Florida-fraud case, Nelson absconded and committed an additional fraud-related offense in Texas.  In the Texas case, Nelson applied for a loan using the name and social security number of an attorney also named Michael Nelson.  After Nelson was convicted of fraudulent use of a social security number, the district court in the Northern District of Texas imposed a 12-month sentence, followed by three years of supervised release.  In February 2004, Nelson began serving his supervised release terms for both the Florida and Texas federal fraud convictions.

2

**B.     2010 Fraud Convictions in Illinois**

In June 2010, a jury in the Northern District Court of Illinois convicted Nelson of six counts of bank fraud, in violation of 18 U.S.C. § 1344(1), and two counts of mail fraud, in violation of 18 U.S.C. § 1341.  Specifically, between February 2004 and January 2005 (i.e., while Nelson was on supervised release for the Florida and Texas fraud convictions), Nelson, using an alias, set up a company in Illinois ostensibly offering consulting services to help churches obtain financing and purchase property.  Nelson, purporting to act as the churches' escrow agent, used the company to defraud the churches and various banks.

The federal district court in Illinois imposed a total 96-month sentence, followed by five years of supervised release, and ordered Nelson to pay $723,867.56 in restitution.  Nelson's supervised release conditions included submitting a truthful monthly report to his probation officer, answering his probation officer's questions truthfully, notifying his probation officer ten days before an employment change, and paying monthly restitution.

**C.     2013 Fraud Convictions in California**

In December 2010, while Nelson was serving his prison sentence in the Illinois case, a federal grand jury in the Northern District of California charged Nelson with 16 fraud-related counts.  In 2013, Nelson pled guilty to one count of wire fraud, in violation of 18 U.S.C. § 1343, one count of computer fraud, in

violation of 18 U.S.C. § 1030(a)(4), and one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A. In this fraud scheme, between January and April 2006 and before his arrest in Illinois, Nelson, who is not a licensed attorney, impersonated a California lawyer, also named Michael Nelson. Nelson then, inter alia, created a law firm and a website, applied for credit, solicited clients, and received retainer funds from clients.

The federal district court in California imposed a 42-month sentence, followed by three years of supervised release, and ordered Nelson to pay $102,800 in restitution. Nelson's supervised release conditions included many of the same conditions as his Illinois supervised release and an additional prohibition against maintaining a position of fiduciary capacity without first obtaining his probation officer's permission.

Nelson completed his custodial sentences and began his supervised release terms on April 25, 2016. The Middle District Court in Florida assumed jurisdiction over Nelson's supervised release in his California case in November 2016 and his Illinois case in April 2017.

## E.    2017 Petitions for Revocation of Supervised Release

In March 2017, Nelson's probation officer in Florida filed a violation report and a petition to revoke Nelson's supervised release in his California case. Later, Nelson's probation officer filed a substantially similar violation report and a

petition to revoke Nelson's supervised release in his Illinois case based on the same conduct. The two petitions and violation reports related to Nelson's employment as a mediator at a Florida company initially called Marsha Ward and Team Ombudsmen and later renamed Team Ombudsmen, LLC. The petitions alleged multiple violations of the terms of Nelson's supervised release, including that Nelson had: (1) maintained a position of fiduciary capacity at Team Ombudsmen in Florida without his probation officer's permission, verified by checks Nelson received from clients of the company but made payable directly to him and deposited into his personal account; (2) submitted untruthful monthly reports; (3) failed to answer his probation officer's questions truthfully; and (4) failed to notify his probation officer of his change in employment.

According to the violation reports, Nelson formed the Florida company with a Texas woman named Marsha Ward, who was the cousin of an inmate Nelson befriended in prison. Ward asked that her name be removed from the business when she realized Nelson was engaged in questionable business practices. Employees of the Florida company told the probation officer that Nelson ran the company, paid their wages, and made hiring and firing decisions. Some employees complained that they had not received paychecks. A company directory listed Nelson as the "Global Chief Litigation Liaison and Compliance Officer." The

5

client checks Nelson deposited into his personal account were for "retainer fees," some related to litigation or audits.

The violation reports also stated that Suzanne and Matthew Brown hired Marsha Ward and Team Ombudsmen to represent their son, who was in federal custody, by, among other things, preparing a 28 U.S.C. § 2255 motion. Between December 2015 and April 2016, the Browns sent Nelson several "retainer" cashier's checks totaling $8,800, which Nelson deposited into his personal bank account. The Browns reported to Nelson's Florida probation officer that they had paid Nelson and Team Ombudsmen a total of $50,000 to help their son.

The Florida probation officer attached to the violation reports a December 16, 2015 letter to the Browns from Nelson as Senior Divisional Chief of Marsha Ward and Team Ombudsmen, which detailed the terms of an "Agreement for Professional Services." The 2015 letter described the professional services to be provided as "Litigation, Research and Litigation Support for" the Browns' son. The Florida probation officer also attached copies of the Browns' cashier's checks made out to Nelson, checks to Nelson from another Team Ombudsman client, Ella Reid, and Nelson's personal bank statements showing that the checks were deposited into Nelson's personal account.

On October 21, 2016, the Florida probation officer visited Nelson at his home, and Nelson denied accepting payments from Team Ombudsman's clients or

6

dealing with the company's payroll.  On the same day, security camera recordings showed Nelson removing computers, printers, and documents from the business.  A few days later, employees reported to the probation officer that Team Ombudsmen's business had been shut down.

Later, the Florida probation officer discovered that in February 2017, Nelson, without notifying the probation officer, created an online church, ostensibly to support the LGBTQ community and individuals affected by the Pulse nightclub shooting incident.  Through a donate button on the website and a GoFundMe page, Nelson had solicited and received $293,000 in donations.

## F.    Initial Revocation Hearing

At the initial revocation hearing, Nelson, by agreement of the parties, admitted to Violation 3 in the Illinois-case petition and Violation 7 in the California-case petition, as amended in open court.  Those two violations, as amended, alleged that Nelson had made unspecified untruthful statements to his probation officer.  In exchange, the government dismissed the remaining alleged violations and agreed to recommend an eight-month sentence.[1]

---

[1]After a preliminary hearing, a magistrate judge dismissed several alleged violations in each petition—pertaining to Nelson's filing of a monthly report in June 2016 and his failure to report his change in employment with the LGBTQ church—because the government had presented insufficient evidence to support probable cause.  The government dismissed another alleged violation relating to Nelson's failure to report $4,000 in pay because the government admitted the check was returned for insufficient funds.

The district court advised Nelson that it would consider the parties'

recommendation at the forthcoming sentencing, but that the requested eight-month

sentence would not bind the court. The district court noted that if the parties

agreed and the agreement was reasonable and within the calculated guidelines

range, "that seem[ed] pretty reasonable to [the court]."

Nelson admitted that he had failed to answer truthfully questions posed by

his Florida probation officer. Without objection, the district court calculated an

advisory guidelines range of 7 to 13 months' imprisonment. The district court

noted that the statutory maximum prison term was three years and the statutory

maximum term of supervised release was five years. After ensuring that Nelson's

admission was free and voluntary, the district court accepted Nelson's plea to the

two amended violations and postponed sentencing.

## G.    Telephone Conference

The probation officer's sentencing memorandum filed in each case

recommended concurrent eight-month sentences. The probation officer noted that:

(1) "[s]ince 1998, Nelson has either been in prison for fraudulent criminal activity

or on supervised release, which he has never completed successfully"; (2) Nelson

posed a risk to the community because of his continued criminal activity, and there

was a great need to protect the public from any further crimes that Nelson might

8

commit; and (3) "Nelson remained undeterred from a life of crime and fraud [and] has shown an utter disregard for the conditions set forth by the [c]ourt."

Prior to sentencing, the district court held a telephone conference with defense counsel and the prosecutor. The district court stated that it had watched a video of victim-impact statements (by the Browns) and "from that video, [it] picked up the file and went through the entire writeup from Probation, and from that, [it] just started digging deeper and deeper into the file." The district court advised the parties that it was no longer inclined to accept the recommended eight-month sentence "based on [its] review of the entire file," and offered to let Nelson withdraw his admission, "notwithstanding the fact that [the court had] told him already . . . that [it] would not be bound by any recommendation to begin with." Nelson's counsel stated that she would meet with Nelson and review everything with him before sentencing. The district court assured defense counsel that she could file whatever motion she felt was appropriate.

After the telephone conference, Nelson's counsel filed a sentencing memorandum requesting that the district court "honor the plea agreement" and impose concurrent eight-month sentences, followed by two years of supervised release. Nelson's counsel also argued that: (1) Nelson pled guilty only to making untruthful statements to his probation officer and any conduct alleged in the dismissed allegations should not be considered in arriving at his sentence; and (2)

9

the district court should not rely upon the Browns' victim-impact video because

their claims in the video were inconsistent with the facts and the violations as

charged in the petitions.

## H.    Final Revocation Hearing and Sentencing

At the November 3, 2017 revocation hearing, the district court adopted the

guidelines calculations without objection, finding that with Grade C violations and

a criminal history category of V, Nelson's advisory guidelines range was 7 to 13

months.

Nelson's counsel acknowledged that the district court was not bound by the

plea agreement but urged the district court to impose the recommended concurrent

eight-month sentences.  In mitigation, Nelson pointed to the recent death of his

mother while he was in custody and his medical issues, which included his HIV

positive status.

Nelson also argued that the Browns' victim-impact video related to alleged

criminal conduct the government had chosen not to pursue and the Browns'

statements constituted unreliable hearsay that was contradicted by other evidence

in the record.[2]  In response, the district court agreed that the video was of "limited

---

[2]Nelson identifies the following statements by the Browns in the video that he contends
were inconsistent with other evidence in the record: (1) that Nelson told the Browns he was an
attorney (when the letter Nelson sent to the Browns on December 16, 2015 disavowed that
anyone at Team Ombudsmen was an attorney); (2) that the Browns paid Nelson a total of
$50,000 (when the cashiers' checks and bank account statements showed they paid Nelson only
$8,800); (3) that Nelson did not perform any work for their son (when in fact their son signed

reliability," and explained that the video merely prompted the court "into a deeper dive into the file where [it] learned a lot of things that [it] found troubling."

The district court stated that the offer for Nelson to withdraw his admission was "still open," and asked if defense counsel had spoken with Nelson about "the advantages and disadvantages of withdrawing his admission at this point." Defense counsel stated that she and Nelson had talked at length, and Nelson had decided not to withdraw his admission. The district court then confirmed with Nelson that he did not want to withdraw his admission.

Nelson then addressed the district court and stated, among other things, that in addition to his HIV status, he also had Hepatitis A, B, and C, and liver damage, and suffered from PTSD due to sexual abuse when he was a child. Nelson also stressed his grief in losing his mother and his rehabilitation efforts, including educational degrees he had earned while incarcerated.

The government asked for the agreed-upon eight-month sentence. The government admitted that, after investigation, it had declined to pursue criminal prosecution of Nelson for the alleged conduct in the violation reports. The government acknowledged that Nelson owed a substantial amount of unpaid

---

and filed a § 2255 motion prepared by Nelson); and (4) that Nelson agreed to do the work pro bono (when Nelson's December 16, 2015 letter listed a retainer of $2,500).

11

restitution, had a significant history of fraud, and posed an economic risk to the community.

The district court stated that it was "very concerned" that Nelson posed a major risk to the public's economic safety given his criminal history. The district court briefly summarized the circumstances of Nelson's fraud in the California and Illinois cases. In response to the district court's questions, Nelson's Florida probation officer advised that: (1) in the California case, Nelson had paid only $2,125 of the $102,800 owed in court-ordered restitution, and (2) in the Illinois case, Nelson had paid only $175 of the $723,867.56 owed in court-ordered restitution. The probation officer admitted to the district court that Nelson "was a difficult person to supervise," but that to protect the public he needed further supervision upon his release.

When the district court asked about the specific nature of Nelson's untruthful statements (the admitted Violation 3 in the Illinois petition and Violation 7 in the California petition), the Florida probation officer testified that, prior to Nelson's release from custody, Nelson informed him of Team Ombudsmen and Nelson's role as a mediator. Suspicious of Team Ombudsmen's activities, the probation officer questioned Nelson about the company and began to investigate the company for fraud but found no identifiable victims or lost monetary amounts until the Browns came forward. When the probation officer began to discuss what

12

the Browns reported, Nelson objected on double- and triple-hearsay grounds.  The district court acknowledged Nelson's hearsay concerns and stated that it would not go "any deeper" with the probation officer's testimony.

Before announcing the sentence, the district court noted that Nelson had "a long history of separating people from their money" and the court had "to look at everything through that prism."  The district court noted that Nelson had been difficult for probation to supervise and had accomplished "little to nothing" while on supervised release.  The district court explained that it had to balance Nelson's personal statement before the court with his actions over the course of a long period of time and also consider the individuals victimized by his conduct.

The district court revoked Nelson's supervised release in both cases.  In the Illinois case, the district court imposed a 30-month sentence, followed by 30 months of supervised release.  In the California case, the district court imposed a concurrent 24-month sentence, followed by no supervised release.  The district court stated that it had considered the 18 U.S.C. § 3553(a) factors and the probation officer's sentencing recommendations and had decided to impose an upward variance because Nelson: (1) remained a danger to society; (2) "paid little to no restitution and accomplished little else while on supervised release"; and (3) "remained undeterred from a life of crime and fraud [and] has shown an utter disregard for the conditions set forth by the [c]ourt."  The district court further

13

observed that, based on Nelson's history and characteristics, an upward variance was necessary to afford adequate deterrence to Nelson's criminal conduct and to protect the public from his further crimes.

Nelson objected to the sentences imposed in both cases.

## II. DISCUSSION

When a defendant violates a condition of supervised release, the district court may revoke the supervised release term and impose a prison term after considering certain factors set forth in 18 U.S.C. § 3553(a). See 18 U.S.C. § 3583(e)(3); United States v. Sweeting, 437 F.3d 1105, 1107 (11th Cir. 2006). The relevant § 3553(a) factors the district court must consider are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for deterrence; (3) the need to protect the public from the defendant's further crimes; (4) the need to provide the defendant with needed educational or vocational training or medical care; (5) the relevant guidelines range; (6) pertinent policy statements of the Sentencing Commission; (7) the need to avoid unwarranted sentencing disparities; and (8) the need to provide restitution to victims. See 18 U.S.C. § 3583(e) (citing 18 U.S.C. § 3553(a)(1), (a)(2)(B)-(D), (a)(4)-(7)). The weight given to any specific § 3553(a) factor is committed to the sound discretion of the district court. United States v. Clay, 483 F.3d 739, 743 (11th Cir. 2007).

14

We review a sentence imposed upon revocation of supervised release for reasonableness under the deferential abuse of discretion standard. Sweeting, 437 F.3d at 1106-07. We first consider whether the district committed any significant procedural error and then whether the sentence is substantively reasonable in light of the relevant § 3553(a) factors and the totality of the circumstances. United States v. Pugh, 515 F.3d 1179, 1190 (11th Cir. 2008). The party who challenges the sentence bears the burden to show the sentence is unreasonable. United States v. Tome, 611 F.3d 1371, 1378 (11th Cir. 2010).

If the district court decides to impose an upward variance, "it must 'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" United States v. Williams, 526 F.3d 1312, 1322 (11th Cir. 2008) (quoting Gall v. United States, 552 U.S. 38, 50, 128 S. Ct. 586, 597 (2007)). A district court is "free to consider any information relevant to [a defendant's] background, character, and conduct in imposing an upward variance." Tome, 611 F.3d at 1379 (quotation marks omitted). We will vacate such a sentence "only if we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." United States v. Shaw, 560 F.3d 1230, 1238 (11th Cir. 2009) (internal quotation marks omitted).

15

## A.    Procedural Reasonableness

Nelson contends his sentences are procedurally unreasonable because the district court relied on hearsay statements from the Browns in their victim-impact video and from Nelson's probation officer in testimony at the revocation hearing.

Although the Federal Rules of Evidence do not apply to supervised release revocation proceedings, hearsay statements may be admissible provided minimal due process requirements are met.  United State v. Frazier, 26 F.3d 110, 113-14 (11th Cir. 1994).  In deciding whether to admit hearsay evidence in a revocation hearing, the district court must balance the defendant's right to confront adverse witnesses against the ground asserted by the government for denying confrontation.  Id. at 114.  A defendant has a due process right, however, not to be sentenced based on false or unreliable information.  United States v. Ghertler, 605 F.3d 1256, 1269 (11th Cir. 2010).  To prevail on such a due process challenge, "a defendant must show (1) that the challenged evidence is materially false or unreliable and (2) that it actually served as the basis for the sentence."  Id. (emphasis added); United States v. Taylor, 931 F.2d 842, 847 (11th Cir. 1991).

With respect to the Browns' victim-impact video, even assuming arguendo that in the video the Browns made materially false and unreliable statements about how much they paid Nelson, what work Nelson performed, and whether he held himself out to them as an attorney, Nelson has not shown that the video or any

16

statements in it served as the basis for his sentences. In fact, the district court agreed that the video was not particularly reliable. The district court explained that the video merely had prompted it to look more closely at Nelson's entire criminal file, where it learned about the full extent of Nelson's criminal history of fraud and the substantial amount of restitution ordered in the two underlying cases. In other words, contrary to Nelson's claims on appeal, it was not the Browns' video, but the troubling information the district court found in Nelson's file that led the district court to reject the parties' recommendation for eight-month concurrent sentences.

As for the probation officer's testimony, Nelson failed to show that his statements were either materially false or unreliable. At the revocation hearing, the probation officer's testimony was limited to Nelson's unpaid restitution balances from his underlying cases, his opinion regarding the need for Nelson's continued supervision, and a description of the beginning of his investigation into Team Ombudsmen, including his conversations with Nelson about his employment as a mediator. Nelson has not contended, much less shown, that any of these statements were false or unreliable.

The probation officer stated that the Browns contacted him claiming to be victims of Nelson's alleged fraud, but that statement is corroborated by the documents the Browns gave to the probation officer. Nelson did not object to these documents, which were attached to the petitions for revocation and the

17

violation reports.  These documents showed that the Browns entered into a contract with Nelson and Team Ombudsmen for legal services, sent several cashier's checks as payment for those services directly to Nelson, and Nelson deposited them into his personal bank account.

Nelson also argues that the district court erred by not performing a <u>Frazier</u> balancing test before permitting the probation officer's testimony about the Browns.  Any error in that regard was harmless, however, given that Nelson has not shown the district court relied on any hearsay statements from the Browns.  <u>See</u> <u>Taylor</u>, 931 F.2d at 847.

Finally, Nelson argues that his sentence is procedurally unreasonable because the district court imposed an upward variance based on conduct other than Nelson's unspecified lie to his probation officer.

Contrary to Nelson's claim, the district court was not limited to looking only at Violations 3 and 7—that he made untruthful statements—which were the basis for the revocation of the defendant's supervised release terms.  Instead, the district court, in determining the appropriate sentence, considers all the pertinent § 3553(a) factors, two of which are the nature and circumstances of the two offenses and the history and characteristics of the defendant.  Further, under federal law, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of any offense which a court of the United

18

States may receive and consider for purpose of imposing an appropriate sentence."
18 U.S.C. § 3661. Likewise, the Sentencing Guidelines also note that the
information a court may consider in formulating a sentence is broad and includes
evidence that would not be admissible at trial so long as the information has
"sufficient indicia of reliability." U.S.S.G. § 6A1.3(a). In fact, sentencing courts
may even consider uncharged and acquitted conduct if it is established by a
preponderance of the evidence. United States v. Smith, 741 F.3d 1211, 1226 (11th
Cir. 2013).

Here, although the Browns' video was not considered reliable, the district
court could still consider the Florida probation officer's testimony about the
Browns and the documents related to the Browns that were attached to the
violation reports. This evidence proved by a preponderance of the evidence that
Nelson, acting as Team Ombudsmen's Senior Divisional Chief, entered into an
agreement to provide the Browns' son with legal services, that the Browns sent
cashier's checks totaling $8,800 made out to Nelson as a retainer to pay for this
legal work, and that Nelson deposited the Browns' cashier's checks into his
personal bank account. In his violation report, the Florida probation officer stated
that when he visited Nelson's residence on October 21, 2016, to discuss Nelson's
employment, Nelson denied accepting payments from Team Ombudsmen clients.

19

Indeed, Nelson does not appear to dispute any of these facts, which amply support the admitted violations.

To the extent Nelson claims the district court relied upon conduct underlying the alleged violations that the government dismissed, the record does not support this assertion.[3]  None of that conduct was discussed during the revocation hearing, and the district court did not refer to any of it in explaining why it had imposed an upward variance.

In sum, Nelson has not shown that his sentence is procedurally unreasonable.

## B.    Substantive Reasonableness

Nelson also has not shown that his total 30-month prison sentence is substantively unreasonable.  The parties agree that, with a Grade C supervised release violation and criminal history of V, Nelson's recommended imprisonment range under advisory Chapter 7 of the Sentencing Guidelines was 7 to 13 months' imprisonment.  See U.S.S.G. § 7B1.4(a).  In addition, the parties do not dispute that the district court could have imposed a prison term of up to three years in the

---

[3]Nelson's reliance on United States v. Ellis, 419 F.3d 1189, 1193 (11th Cir. 2005), is misplaced.  Here, the district court did not impose an upward departure under the Sentencing Guidelines but rather an upward variance from the recommended advisory guidelines range based on the § 3553(a) sentencing factors and the totality of the circumstances.  Cf. Ellis, 419 F.3d at 1193 (concluding a sentencing court's reliance on conduct underlying a dismissed charge to support a departure under U.S.S.G. § 5K2.7 should be limited to situations in which the conduct "sheds further light on the true nature of the offense of conviction").

20

Illinois case and up to two years in the California case. See 18 U.S.C. §§ 3559(a)(2), (a)(3), 3583(e)(3).

The district court explicitly stated that it had considered the § 3553(a) factors and cited in particular the need to protect the public from any further criminal activity by Nelson. The district court stressed Nelson's long history of defrauding people, which the district court described as "an ongoing theme" that had made Nelson "well equipped at separating people from their money." The district court also noted that Nelson had been difficult to supervise and had not accomplished much while on supervised release. As justification for the upward variance, the district court cited Nelson's continuing danger to society, his lack of progress in paying restitution, and his utter disregard for the conditions of supervision, which suggested Nelson was not ready or willing to live a law-abiding life.

We disagree with Nelson that the district court based his sentences entirely on his outstanding restitution amounts or gave that factor too much weight. While the district court certainly considered Nelson's failure to make any real progress in paying court-ordered restitution, the record shows that the district court also considered Nelson's personal statements to the court, his criminal history, and his

21

other conduct while on supervised release, not least of which would be his admitted false statements to his probation officer.[4]

Moreover, it was well within the district court's discretion to give particular weight to Nelson's unpaid restitution, his criminal history, and his unwillingness to comply with the conditions of his supervised release and to find that Nelson's mitigating evidence was insufficient to warrant the requested eight-month sentence. Nelson's criminal history readily reveals him to be a career con artist who has never managed to complete a term of supervised release without engaging in new fraudulent activity. Nelson's past fraud schemes involved establishing businesses through which Nelson bilked clients and banks of more than a million dollars. This time, upon his release, Nelson was again working for a business that offered legal services to clients. Regardless of whether Nelson in fact committed any fraud while at Team Ombudsmen, he lied to his probation officer about depositing payments from clients into his personal account. Considering Nelson's past crimes, his failure to answer truthfully his probation officer's questions about his new business activity was more than a mere technical violation of his supervised release condition. As a former con man, Nelson must be scrupulous

---

[4]Given that Nelson's sentences were not based solely on his failure to pay restitution, there is no merit to Nelson's equal protection challenge to his sentences. See United States v. Plate, 839 F.3d 950, 956 (11th Cir. 2016) (holding that incarcerating a person solely based on his inability to pay a fine or restitution violates equal protection principles).

22

with the truth while on supervision and in all his dealings with his probation officer.

In conclusion, we cannot say the district court's decision to impose an upward variance in this case was an abuse of discretion. On this record, Nelson's total 30-month sentence was both procedurally and substantively reasonable.

**AFFIRMED.**